Joshua E. Matic (SBN 259070)
20651 Golden Springs Dr, # 817,
Walnut, CA 91789
Tel: 646-389-4384
Fax: 310-388-3047
www.maticesq.com
joshuae@maticesq.com
Attorney for Plaintiff,
NEVADA BREEZE

**UNITED STATES DISTRICT COURT FOR THE**
**CENTRAL DISTRICT OF CALIFORNIA**

– – – – – – – – – – – – – – – – – – – – – –X

| | |
|---|---|
| NEVADA BREEZE, | Case No._____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| COUNTY OF LOS ANGELES, CITY OF PASADENA, KARLA BENNETT, *individually and in her official capacity*; SAMANTHA GREEN, *individually and in her official capacity*; KAISER FOUNDATATION HEATH PLAN, INC., *a.k.a* KAISER PERMANENTE; KAISER FOUNDATION HOSPITALS *a.k.a.* KAISER PERMANENTE; and DOES 1-10 | |
| Defendant(s).     : | |

– – – – – – – – – – – – – – – – – – – –X
                                        _

Plaintiff, NEVADA BREEZE ("Breeze"), by and through her attorneys, Joshua
E. Matic, for her Complaint against Defendants, avers as follows:

**INTRODUCTION**

1. Plaintiff's complaint centers around the failings of government actors and Kaiser
Health Plan, Inc.'s actions aimed at "covering up" those failings. Plaintiff was

detained without cause, based on the bald and baseless assertions of a mentally ill woman. Plaintiff was involuntarily placed on a 5150 hold. After Plaintiff's detention—which resulted in loss of professional licensure—Kaiser Health Plan, Inc. and an unknown number of doe defendants acted to "limit" liability by illegally altering Plaintiff's medical records, attempting to create cause for Plaintiff's detention after the fact.

## JURISDICTION

2. Plaintiff's claims arise under the Fourth and Fourteenth Amendments to the United States Constitution, as made actionable by 42 U.S.C. § 1983. Plaintiff's claims present federal questions over which this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C § 1343(a). This Court has supplemental jurisdiction over state law claims brought by Plaintiff pursuant to 28 U.S.C § 1367.

## VENUE

3. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) & (2), because natural-person defendants are residents of the Central District of California, Defendant County of Los Angeles (the "County") is in the District, and a substantial portion of the events giving rise to this claim occurred in the District.

**PARTIES**

4.  Los Angeles County is a county of the State of California duly authorized to operate under the laws of the State of California, located within the District.

5.  Defendant City of Pasadena (on occasion "Pasadena" or the "City") is a municipality formed and duly authorized to operate under the laws of the State of California, located within the district; the City of Pasadena Police Department (the "Police Department") is a Department of the City of Pasadena.

6.  Los Angeles County Department of Mental Health (the "DOH"), is not a named party in this suit; however, the DOH is a Department of Los Angeles County which through its employees and agents employed Defendants Karla Bennett and Samantha Green and set the policies, customs, and procedures of Los Angeles County pursuant to which Defendants' Bennett and Green acted.

7.  On information and belief, the City and County collaborate on certain mental health response programs, for instance (S.M.A.R.T., H.O.P.E., P.E.T.); while there exists cooperation between the County and City in responding to "mental health" emergencies on information and belief there is little to no sharing of information and no communication of information is mandatory.

8.  Karla Bennett ("Bennett") is a natural person, who on information and belief resides in the District and is a citizen of the State of California. Karla Bennett is,

and was at all pertinent times, an employee of the County who acted in an official capacity under color of law.

9.  Samantha Green is a natural person, who on information and belief resides in the District and is a citizen of the State of California. Samantha Green is an employee of the County who acted in an official capacity under color of law.

10. Kaiser Foundation Health Plan, Inc. ("KHP") is a California corporation with its principal office at One Kaiser Plaza Oakland, California. On information and belief KHP owns and controls all other Kaiser Defendants (KHP together with Kaiser Foundation Hospitals, Southern California Permanente Medical Group, Inc., and their respective employees, are referred to throughout the complaint each as a "Kaiser Defendant" and collectively as "Kaiser Defendants").

11. Kaiser Foundation Hospitals ("KFH") is California corporation with its principal office at One Kaiser, Plaza Oakland, California. On information and belief, Kaiser Foundation Hospitals and KHP, together with their subsidiaries, operate as the entity colloquially known as "Kaiser Permanente."

12. Southern California Permanente Medical Group, Inc. 393 East Walnut, Pasadena California is not named as a party in this suit; however, on information and belief, Southern California Permanente Medical Group, Inc., is the subsidiary partially responsible for the maintenance of Kaiser Permanente's records.

13. Does 1-10 are persons or entities whose true names and identities are unknown, who therefore are sued under fictitious names. Each Doe is an employee or subsidiary of a Kaiser Defendant. On information and belief each of the fictitiously named defendants are responsible in some manner for the injuries and events alleged herein, and are jointly and severally liable to Plaintiff. Plaintiff will seek leave of court to amend this complaint to state the true names and capacities of such fictitiously named defendants when such names are ascertained.

14. Betty Shanklin ("Ms. Shanklin" or "Mother")—not a party to this suit—is the mother of Plaintiff. Plaintiff was forced to live with Mother to provide her care; Ms. Shanklin is incapable of living independently. Ms. Shanklin suffers from mental illness, having been diagnosed with major depression with psychosis. Ms. Shanklin was well known, as was her mental health condition, to local County workers, as well as City emergency service workers. Pertinently, Ms. Shanklin was placed on a 5150 hold by the County on June 23, 2020.

## FACTS

## <u>Background</u>

15. Due to Ms. Shanklin's deteriorating mental health Plaintiff moved back home to Pasadena California, to care for Mother; Plaintiff resides with Mother in Mother's home located at 1787 La Cresta Drive, Pasadena.

16. On information and belief, Ms. Shanklin was well-known in the local emergency services community: on information and belief between 2015 and September 2020 Mother placed over 100 calls to the Pasadena Police Department. Further, on multiple occasions Adult Protective Services, a sub-unit of the DOH, and the DOH on multiple occasions responded to calls at the 1787 La Cresta Drive residence (on occasion the "Home").  In short, Ms. Shanklin and her condition were well known and documented in the emergency services community at both a County and City level.

17. Karla Bennett supervised both Samantha Green and Joyce Mantuno. Joyce Mantuno was the County social worker most often in contact with Ms. Shanklin.

18. Ms. Shanklin's condition was increasingly concerning in 2020. In this year, Shanklin filed six separate restraining orders—three against Plaintiff alone, two against Plaintiff's work associates, and one against Ms. Shanklin's granddaughter. All six restraining orders were denied.

19. In the months and days preceding the incident giving rise to the instant suit,  Ms. Shanklin called emergency services multiple times.

20. These calls to emergency workers followed a similar pattern:

- On June 23, 2020, Ms. Shanklin reported that she had been assaulted; requested Plaintiff be removed from the Home; police responded and concluded the allegations were not credible and that Plaintiff could not be legally removed from the Home.

- On August 20, 2020, Ms. Shanklin again reported that she had been assaulted and requested Plaintiff be removed from the Home; police concluded the allegations were not credible and further noted "RP" was "918."[2]

- On August 21, 2020, Ms. Shanklin yet again reported she was the victim of assault; again, requested Plaintiff be removed; and again, the police determined her reports were not credible and that Plaintiff should not be removed from the Home.

In each of these incidents, Mother was accusing her daughter of violence against her person—the Police Department had determined that Mother's reports were not credible and that mother was a "918." Or insane person.

21. Plaintiff at no time has been violent or abusive towards Mother; much the opposite, she acts as Mother's caretaker because Mother is incapable of caring for herself.

---

[2] "RP" or reporting party referred to Ms. Shanklin; "918" is police shorthand for an "insane person."

22. Further, Plaintiff, prior to, the 5150 detainment had no history of mental health issues; Plaintiff was never, and is not, a danger to herself or others.

23. The call on June 23, 2020, is of particular importance in that Mother was placed on a 5150 hold—this was, at a minimum the second time Ms. Shanklin had been placed on an involuntary hold.

24. Apart from the above-mentioned calls to Pasadena Police Department, Ms. Shanklin made over 75 calls to Los Angeles County Adult Protective Services ("APS"). On information and belief, virtually all calls and reports regarding Plaintiff involved the same allegations and request—namely that Mother had been assaulted and that Plaintiff should be physically removed from the Home.[3]

25. On the morning of September 13, 2020, Defendants Bennett and Green approached Plaintiff as she left her home.

26. This morning had been particularly stressful and chaotic: Mother had cut all ethernet cables disconnecting the Home from the internet and broken off a key in Plaintiff's studio door. Leaving Plaintiff completely unable to work, forcing Plaintiff to contact a locksmith, and generally placing Plaintiff in a poor mood.[4]

---

[3] While there are, admittedly, slight variations—stealing pots, placing furniture in the Home, hiding dentures, spitting in food, turning off the water heater to force Mother to take cold showers—the reports consistently involved Plaintiff causing Mother physical harm.
[4] Plaintiff was forced to install locks in the Home due to Mother's condition. Mother continually sabotaged these locks, by placing keys in them and breaking the keys off while inserted in the locks.

27. On information and belief, Ms. Shanklin had contacted APS—which was familiar with Ms. Shanklin's behavior and mental instability—requesting an evaluation of Plaintiff because:

[Plaintiff] turned off the pilot to the water heater deliberately and enjoys seeing [Mother] suffer by taking cold showers. Turned on the gaslight of the pilot on the stove and big ball of fire came out. *Hit [Mother] in the head with cheese.* [Plaintiff] bangs on the door when client is sleeping. [Plaintiff] *hides* [*Mother*'s] *dentures and put it in the stereo.* [Plaintiff] talks to herself, standing in front of the mirror talking to her dead grandma. Denies suicidal ideation or homicidal ideation but she wants to hurt [Mother] real bad. Caller reports that [Plaintiff] has been acting like this since June 2020. Trying to steal the home away from [Mother].

28. Green and Bennett relied heavily on "collateral" information provided by Mother in their risk assessment and Application for Assessment, Evaluation, Crisis Intervention or Placement for Evaluation and Treatment.

29. Green and Bennett refused to consider or credit evidence that Ms. Shanklin was unwell or that Plaintiff presented no danger to herself or Mother.

30. Green and Bennett failed to independently verify the allegations made by Ms. Shanklin.

31. Green and Bennett based the hold on Plaintiff being a "risk" based on entirely on Mother's allegations.

32. Green and Bennett did not believe Plaintiff was under the influence of drugs or an addict.

33. A cursory examination of readily available records would have demonstrated that Mother was indeed diagnosed with psychosis, had made well over a hundred calls paralleling the allegations, erroneously credited by Bennett and Green, ultimately leading to their 5150 detainment, and that all were found to be frivolous.

34. Plaintiff was coherent, calm, and cooperative in all of her interactions, at all pertinent times, with all Defendants. Nothing in Plaintiff's behavior or statements would lead a reasonable professional to believe there was probable cause to detain Plaintiff under Welfare and Institutions Code section 5150.

35. The "probable cause" leading to the 5150 detainment was based on: 1, allegations made by a woman suffering from a known mental illness; and 2, "paranoia," 'irritation," and "improper" focus on Mother's mental illness and behavior which was completely reasonable given that Mother was in fact mentally ill.

36. Plaintiff was physically restrained and transported to Kaiser Hospital; Plaintiff was not free to leave.

37. After two days, on September 15, 2020, a Kaiser Defendant medical provider determined that Plaintiff did not meet any legal criteria for 5150 hold, that Plaintiff had no psychotic diagnosis, that medication for psychotic disorder was

not indicated, and that Plaintiff would only potentially need psychotherapy *to help her with the stress of dealing with Mother.*

## **Post-Detainment Facts & Procedural Background**

38. Plaintiff suffered economic and non-economic damages from the 5150 detainment.

39. Plaintiff can no longer possess a firearm; Plaintiff was formerly certified as a security professional and held a license which allowed her to act as armed private security (a "Guard Card"). As a result of the 5150 detainment, Plaintiff has lost: 1, her Guard Card; 2, her concealed carry permit, as well as her right to own a firearm; and 3, her employment in an extremely lucrative field.

40. The 5150 detainment proximately caused lost income, loss of employment in an entire field, and a change in legal status and rights.

41. Plaintiff no longer qualifies for certain state benefits, for instance the In-Home Supportive Services Program, and its payments. This is solely due to the 5150 detainment and the acts of Defendants complained of herein.

42. The 5150 detainment has exposed Plaintiff to humiliation, scorn, and damaged Plaintiff's reputation.

43. The 5150 detainment and accessible records thereabout have resulted in disparate and disadvantageous treatment in medical care: in November of 2020,

Plaintiff was bleeding internally after a hysterectomy; Plaintiff was "recovering" from the procedure and felt increasing pain. On multiple occasions, Plaintiff informed medical personnel of her extreme pain and discomfort. Plaintiff received no medical attention and no screening for three to four hours. Each of the above-noted complaints were symptoms of internal bleeding.

44. Plaintiff was in fact bleeding internally and had lost approximately 8 pints of blood. After emergency surgery, Plaintiff was informed that she almost died and that she was not screened or treated because of the presence of the 5150 hold on her records.

45. Plaintiff filed suit *pro se* in the Superior Court of California, County of Los Angeles, on September 3, 2021 (Case No. 21 STCV 32750) (hereinafter the "State Action"). This suit was dismissed without prejudice.

46. Plaintiff was incapable of retaining an attorney in the State Action and conducted all discovery and litigation *pro se*.

47. On December 1, 2021 Plaintiff subpoenaed a full history of her medical records ("Altered Records") from Kaiser Permanente. Prior to this Schuler Brown, a third-party law firm, had received Plaintiff's medical records from Kaiser Permanente via a HIPPA release signed by Plaintiff on October 28, 2020 ("Original Records").

48. Plaintiff received the Original Records on January 14, 2022, from Schuler Brown.

49. On January 25, 2022, Plaintiff drafted letter to Kaiser Permanente requesting Kaiser remove the erroneous records of the 5150 detainment and explaining her predicament: 1, the 5150 appearing on her record caused her significant harm, especially the loss of blood and non-treatment followed by an emergency surgery at a Kaiser hospital; 2, there was no basis for the 5150 hold; and 3, despite on-going State Action there did not appear a ready way to remove the erroneous 5150 hold from her medical records.

50. On February 3, 2022, Plaintiff's medical records were significantly altered— Kaiser Permanente later reported this was due to a glitch.

51. The Altered Records state that Doctor Fariba Ariz ("General Practitioner") made the alterations.

52. On information and belief General Practitioner did not make the alterations to Plaintiff's medical records, but rather two or more Doe defendant's working in concert altered the records in an attempt to avoid liability in the State Action or a future malpractice action.[5]

---

[5] The "treatment" provided in November of 2021, at a Kaiser Permanente facility, almost resulted in Plaintiff's death. Plaintiff had received a fairly routine surgery but suffered internal bleeding post-surgery. This internal bleeding was ignored for hours. Kaiser Permanente "gave" this treatment to the Plaintiff for "free" never billing Plaintiff for either the botched surgery or the emergency "repair" surgery. On information and belief, Plaintiff was provided these services gratis in an attempt to avoid litigation.

53. On February 12, 2022, Plaintiff began an internal Kaiser Permanente dispute.

54. Later, on February 22, 2022, Plaintiff received the Altered Records from Kaiser Defendants produced in response to the December 2021 subpoena. These altered records significantly changed record of Plaintiff's 5150 detainment: *inter alia* the altered records contain notes that Plaintiff refused medication, was diagnosed with an "unspecified" psychotic disorder, and added records of treatment of Plaintiff by General Practitioner going back to 2004—it was General Practitioner who is noted as having made the alterations in the Altered Records; General Practitioner had only been treating Plaintiff for approximately a year.

55. Each of these additions in the Altered Records is false and does not appear in the Original records.

**COUNT ONE:**

**Fourth and Fourteenth Amendments—False Arrest, 42 U.S.C. § 1983**

*Against County, Green, in her official and personal capacities, and Bennett, in her official and personal capacitates.*

56. Paragraphs 1-55 are incorporated herein by reference.

57. Defendant's Green and Bennett intentionally caused the detainment of Plaintiff; Plaintiff did not consent to the detainment.

58. Green and Bennett did not have probable cause to believe that Plaintiff was "a danger to others, or to himself or herself, or gravely disabled" due to a mental health disorder, as required to initiate a detention of the person of danger under the 5150 statute.

59. No reasonable decision maker would have determined that such probable cause existed.

60. Further Green and Bennett ignored required legal duties: 5150 requires the decision maker to consider available information relevant to the allegation and shall consider both (1) evidence presented by a family member; and (2) evidence presented by the person of danger.

61. According to Green and Bennett's 5150 Application, they did not have probable cause to believe that Plaintiff was a danger to others, or gravely disabled; they stated they had probable cause to believe Plaintiff was a danger to herself.

62. Information from Plaintiff's Mother did not support a probable cause to believe Plaintiff was a danger to herself or others.

63. To the extent that the Green and Bennett perceived Plaintiff's grooming and hygiene as suboptimal and Plaintiff as overly-dramatic, pressured, restless, that cannot give a reasonable decisionmaker a probable cause to believe Plaintiff was a danger to herself or others.

64. According to the Green and Bennett's Risk Evaluation Tool, they did not factor Plaintiff's credible explanation of her stress into their assessment—to wit, her mentally-ill Mother, the reporting party.

65. A reasonable decision maker would have considered Plaintiff's explanation and would have never ignored documentary evidence supporting the explanation.

66. Prior to being restrained to the ambulance stretcher, Plaintiff invited Bennett and Green to enter her home to discredit or disprove allegations—namely a broken window, which was in fact not broken. This nonexistent broken window was later cited as "evidence" of Plaintiff's "illness."

67. Green and Bennett refused the offer to enter Plaintiff's home.

68. Prior to being detained Pasadena Police Department Officers on scene were available to Defendants Green and Bennet to discuss the serried interactions with Ms. Shanklin, which would have discredited all of Mother's accusations.

69. Green and Bennett refused to consult Pasadena Police Department Officers and Pasadena Police Department Officers did not volunteer information to Bennett and Green.

70. Prior to causing detention, Bennett and Green had, or should have had, available to them records containing prior successful 5150 application of Ms. Shanklin, and numerous reports documenting Ms. Shanklin's mental instability.

71. Defendants refused to consult these reports and records.

72. Prior to causing detention, Bennett and Green had available to them a social worker from the same office who had been assigned to the Ms. Shanklin's case since June 2020, namely Joyce Mantuno.

73. Bennett and Green did not utilize such available information.

74. As a result of Bennett and Green' actions, Plaintiff was involuntarily held for two days.

75. On information and belief, there exists no policy requiring County social workers, or County workers, to check readily available records of reporting party's credibility or mental capacity prior to detaining a third-party solely on reporting party's unverified report; on information and belief, there is no policy requiring even *de minimus* information sharing of such records between County and City agencies and actors; on information and belief there is not even a requirement to check internal DOH records for such information.

76. On information and belief, this policy, or lack thereof, was a proximate cause of Plaintiff's injuries.

77. The detention deprived Plaintiff of her liberty and caused her emotional harm.

78. Plaintiff seeks an award from County for compensatory damages according to proof at trial.

79. In committing the acts and/or omissions alleged, Defendants Green and Bennett, and each of them, have been guilty or malice (fabrication of evidence), fraud

(same), therefore, Plaintiff seeks an award of compensatory and punitive damages against Defendants, and each of them personally, according to proof at trial.

## COUNT TWO:

### Fourth and Fourteenth Amendments—False Imprisonment, 42 U.S.C. § 1983

*Against Green, in her official and personal capacities, and Bennett, in her official and personal capacitates.*

80. All previous paragraphs are incorporated here.

81. Plaintiff was wrongfully restrained, confined, and/or detained by Bennett and Green.

82. County defendants intentionally deprived Plaintiff of her freedom of movement by placing her on a § 5150 hold and informing Plaintiff that she couldn't refuse the hold, while police officers were on scene, making it clear that if Plaintiff refused, physical force would be used to restrain her.

83. Plaintiff did not consent to the restraint, confinement, and/or detention.

84. The contradictions between the falsehoods contained in Bennett and Green's Evaluation and Application and the truthful reports and statements made by Plaintiff while involuntarily held resulted in Plaintiff's detention being extended.

85. None of the reasons cited by Kaiser employees for the continued hold: broken windows, violence towards Mother, on August 20, 2020, and restraining order,

were true or credible,[10] but were reported to Kaiser by Bennett and Green after a constitutionally inadequate investigation which led to Plaintiff's original seizure and subsequent confinement.

86. Plaintiff was actually harmed.

87. In committing the acts and/or omissions alleged, Bennett and Green, and each of them, have been guilty or malice, fraud, or oppression and, therefore, Plaintiff seeks an award of compensatory and punitive damages against those Defendants, each of them personally, according to proof at trial.

## COUNT THREE:

### Fourth and Fourteenth Amendments—Fabrication of Evidence, 42 U.S.C. § 1983

*Against Green, in her official and personal capacities, and Bennett, in her official and personal capacitates.*

88. All previous paragraphs are incorporated here.

89. Bennett and Green deliberately fabricated evidence and provided it to Kaiser Permanente.

90. While Bennett and Green's 5150 Application only claims probable cause to believe that Plaintiff is a danger to herself but not a danger to others nor gravely disabled, Bennett and Green communicated to Kaiser through other means that Bennett and Green believed that Plaintiff had a drug problem and paranoid delusions causing her to be a danger to herself and to others.

---

[10] As stated above these allegations were investigated and found frivolous by both Pasadena Police and the Courts of the State of California.

91. Specifically, Bennett and Green informed Kaiser that Plaintiff was trying to hurt Ms. Shanklin and smash the windows in Home; that Bennett and Green observed so; that the County knew of a history of violence between Plaintiff; that Ms. Shanklin had a restraining order by the Ms. Shanklin against the Plaintiff; and that Pasadena Police had past involvement with such violence. Each and every one of these secondhand allegations passed on to those responsible for the continued confinement of Plaintiff was not only false, but the falsity of such was readily determinable and available to Defendants Green and Bennett.

92. Kaiser Permanente's medical personnel believed the defendants' false allegations.

93. Bennett and Green knew, or should have known, that the above allegations were false or unsupported by available information.

94. Bennett and Green continued their "investigation" of Plaintiff ignoring readily available evidence and failing to investigate any circumstance which would support Plaintiff's statements.

95. The fabricated allegations of Bennett and Green resulted in the deprivation of liberty of Plaintiff.

96. In committing the acts and/or omissions alleged, Bennett and Green, and each of them, have been guilty or malice, fraud, or oppression and, therefore, Plaintiff

seeks an award of compensatory and punitive damages against those

Defendants, each of them personally, according to proof at trial.

### COUNT FOUR:

**Fourth and Fourteenth Amendments—Inadequate Training & Supervision, 42 U.S.C. § 1983**

*Against County and City*

97. All previous paragraphs are incorporated here.

98. The County of Los Angeles' training program is inadequate to the public health task of initiating 5150 holds *only* on individuals of danger fitting the legal criteria.

99. The City's training program is inadequate to the task of assisting in the initiation of 5150 holds.

100.    On information and belief, the County and the City coordinate and cooperate in the initiation of 5150 holds. On information and belief both County and City agents regularly appear on-scene.

101.    The training program of the City is inadequate to train City agents to share and volunteer critical information which may be relevant to whether a 5150 reporter is credible or whether a 5150 detainment should occur.

102.    On information and belief, the City offers no training requiring its agents to share such information with County agents when cooperating with County agents.

103.     The training program of the County is inadequate to train County agents

or to check local publicly available records to verify whether a 5150 reporter is

credible or to inquire from City agents for relevant information.

104.     On information and belief, there exists no policy requiring County or City

agents, to check readily available records of reporting party's credibility or

mental capacity prior to detaining a third-party; on information and belief, there

is no policy requiring even *de minimus* information sharing of such records

between County and City agencies and actors regardless of how readily

available such information is; on information and belief there is not even a

requirement to check internal DOH or City Police records for such information;

on information and belief, this joint training policy of City and County, or lack

thereof, was a proximate cause of Plaintiff's injuries.

105.     The training programs of City and County are inadequate to train agents

to accurately identify probable cause whether a person subjected to a 5150 report

fits the legal criteria for a 5150 hold.

106.     As a result, the County and City have been deliberately indifferent to the

rights of persons they come into contact, including Plaintiff.

107.     If the County and City had in place an information sharing system, or if

County agents had to check readily available internal or local records, or if City

responders had to share pertinent information, Plaintiff would never have been

injured because Bennett and Green would have been forced to realize that Ms. Shanklin was not credible.

108.    As a result, Plaintiff suffered a 5150 detainment on demonstrably false information and obviously unreliable information from the Ms. Shanklin and inadequate probable cause, which actually violated Plaintiff's constitutional rights.

109.    Plaintiff seeks compensatory damages from County and City according to proof at trial.

**COUNT FIVE:**

**Fourth and Fourteenth Amendments—Goodname and Reputation, Stigma-Plus, 42 U.S.C. § 1983**

*Against County, City, Green, in her official and personal capacities, and Bennett, in her official and personal capacitates.*

110.    All previous paragraphs are incorporated here.

111.    Green, Bennett, County, and City (collectively "Government Defendants") by their above described actions deprived Plaintiff's liberty interest in her good name, reputation, honor, and integrity.

112.    Records of Government Defendants' 5150 hold of Plaintiff was circulated to government database regulating rights to bear arms, which damaged Plaintiff's good name, reputation, honor, and integrity.

113.     Apart from the detention caused by the false allegations contained in Bennett and Green's Evaluation and Application, the 5150 label has exposed Plaintiff to scorn and humiliation.

114.     As a result of the 5150 hold, Plaintiff has lost her right to bear arms in connection with laws forbidding individuals subjected to 5150 holds to bear arms; further, Plaintiff has lost her legally issued Guard Card; further still, because of the foregoing Plaintiff is barred from working in her chosen profession.

115.     Plaintiff seeks compensatory damages from all defendants and punitive damages from Green and Bennett in their personal capacities.

**COUNT SIX:**
**CIVIL CONSPIRACY**
*Against KHP, KFP, and Doe Defendants 1-10*

116.     On information and belief at least two Doe defendants came to an agreement to amend, supplement, and alter Plaintiff's medical records.

117.     Plaintiff sent her January 25, 2022 Letter to the legal department of Kaiser Permanente. On information and belief, the legal department of Kaiser Permanente cannot, by system design, alter medical records.

118.     On information and belief, only certain agents of Kaiser Permanente working in the records office or as treatment providers can alter medical records.

119.    On information and belief a Kaiser Defendant agent, from Kaiser Permanente's legal department, Doe 1, contacted another Kaiser Defendant agent who had the ability to alter medical records—a party who was either a member of the records department or treatment provider, Doe 2.

120.    On information and belief, at least Doe 1 and Doe 2 (collectively "Doe Defendants") reached an agreement to alter Plaintiff's medical records. On information and belief this was done to protect Kaiser Permanente from liability in either the State Action or a feared future-malpractice action for the acts taken by Kaiser Permanente agents in November 2021.

121.    On information and belief, Doe 2 fraudulently altered Plaintiff's medical records under the name of General Practitioner.

122.    Pursuant to this agreement Doe Defendants violated California Penal Code section 471.5 and California Business and Professions Code 2262.

123.    To wit, Doe Defendants caused additional evidence to be placed in Plaintiff's medical record relating to the initial evidence justifying the 5150 detainment.

124.    Further, Doe Defendants caused a new diagnosis of "psychotic disorder" to be entered in throughout Plaintiff's medical record—in essence inserting far back in time a fraudulent diagnosis.

125.     This "unspecified type" "psychotic disorder" was first placed in Plaintiff's medical record on or about February 3, 2022.

126.     Upon information and belief, this diagnosis was not entered pursuant to any actual diagnosis, but rather solely to undermine Plaintiff's then pending State Action.

127.     The actions of Doe Defendants occurred during the course of their employment and was within the scope of their employment.

128.     This conduct was both criminal and "unprofessional." Accordingly, the conduct was wrongful and perpetrated for a wrongful purpose.

129.     This conspiracy has caused Plaintiff damage.

130.     Plaintiff seeks compensatory and punitive damages according to proof.


WHEREFORE, Plaintiff prays for judgment against Defendants and DOES 1-10 inclusive, and each of them, as follows:

1.  For general and incidental damages according;

2.  For past and future medical expenses, including mental health therapy as a result of the confinement;

3.  For other economic and special damages according to proof;

4. For costs of suit and reasonable attorneys' fees as provided by law, including but not limited to 42 U.S.C. 1988.

5. For punitive damages as provided by law, including, but not limited to 42 U.S.C. 1983 against individual defendants named in personal capacity in an amount according to proof at trial;

6. For pre-judgment interest according to proof;

7. For sealing of all records of Plaintiff's confinement under Welfare and Institutions Code § 5150, and the restoration of Plaintiff's right to possess a firearm; and

8. For such other and further relief as the Court deems just and proper.

DATED: August 29, 2022

By /s/ Joshua E. Matic
Joshua E. Matic (SBN 259070)
20651 Golden Springs Dr, # 817,
Walnut, CA 91789
Tel: 646-389-4384
Fax: 310-388-3047
www.maticesq.com
joshuae@maticesq.com
*Attorney for Petitioner: Nevada Breeze*